**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JEAN PIERRE BOUTIN, | ) | |
| *Plaintiff*, | ) | 3:21-CV-1630 (SVN) |
| | ) | |
| v. | ) | |
| | ) | |
| COMCAST CABLE | ) | |
| COMMUNICATIONS MANAGEMENT, | ) | |
| LLC, | ) | July 17, 2023 |
| *Defendant*. | ) | |

<u>**RULING AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

Sarala V. Nagala, United States District Judge.

In this employment discrimination action, Plaintiff Jean Pierre Boutin alleges that Defendant Comcast Cable Communications Management, LLC discriminated and retaliated against him based on his race and color. Specifically, Plaintiff's complaint consists of eight counts alleging race and color discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq.* (the "CFEPA"). Presently before the Court is Defendant's motion seeking summary judgment on each of Plaintiff's claims. For the reasons described below, Defendant's motion is GRANTED IN PART and DENIED IN PART.

## I. FACTUAL BACKGROUND

Unless otherwise noted herein, the parties agree on the following facts. Defendant provides cable, entertainment, and communications products and services to customers. Pl.'s Local Rule ("L.R.") 56(a)2 Statement ("St."), ECF No. 41-2, ¶ 1. Plaintiff, who is African-American and Black, began working for Defendant as a "Retention Agent" in April of 2015, and he presently remains employed by Defendant. *Id.* ¶¶ 4–6, 9; Ans., ECF No. 13, ¶ 16. As a Retention Agent,

Plaintiff fields calls from customers who intend to downgrade their services. Pl.'s L.R. 56(a)2 St. ¶ 7. Plaintiff is responsible for engaging such customers in dialogue in accordance with Defendant's guidelines and attempting to both retain the customers and assist them in exploring the services that might be most appropriate for them. *Id.* In more recent years, Plaintiff has also been responsible for selling products such as cell phones to customers during calls. *Id.* ¶ 8.

Defendant evaluates Retention Agents' performance based on various quantitative and qualitative factors. *Id.* ¶ 10. Defendant measures Retention Agents' performance quantitatively based on certain metrics: a First Call Resolution ("FCR") metric, which measures the percentage of times a customer inquiry is resolved on the first call, and Retained Revenue and Revenue Generated Units ("RGU") Retained metrics, which relate to the agent's effectiveness in retaining overall revenue and business on each contract. *Id.* ¶¶ 11–14. The qualitative factors relate to agents' behavior on calls. *Id.* ¶ 15. For example, Defendant expects its Retention Agents to: be warm and friendly, "own[] the interaction," show appreciation, build rapport, "mak[e] it effortless," listen actively and respond appropriately, "discover[] needs," be "an Xfinity Ambassador," and set clear expectations. *Id.* ¶ 16. Defendant calls these behaviors the "s4x" behaviors, which is short for "Start, Solve, Sell, Summarize." *Id.* Occasionally, supervisors and peers of a Retention Agent listen to calls to evaluate whether the Retention Agent is adhering to these ideals, and to examine how the Retention Agent is going about realizing the ideals. *Id.* ¶ 18. It is important that Retention Agents meet the metric quotas and goals Defendant sets; the parties agree that it is appropriate for Defendant to coach or discipline employees who are not meeting such quotas and goals. *Id.* ¶ 19.

Defendant assigns each Retention Agent to a team, and each team is led by a Retention Supervisor. *Id.* ¶ 20. At the times relevant to this action, all Retention Agents and Retention

Supervisors reported to Timothy Noonan, Defendant's Senior Manager for Retention.  *Id.* ¶ 21. Noonan, in turn, reported to Carlos Clinton, Defendant's Director of Customer Care – Retention and Billing.  *Id.* ¶ 22.  From December 31, 2017, until August 24, 2019, Plaintiff's Retention Supervisor was Johnny Lopez-Santos.  *Id.* ¶ 23.  Lopez-Santos supervised a diverse team of approximately fifteen Retention Agents, including four people of color. *Id.* ¶ 24.  He held weekly one-on-one meetings with each Retention Agent and evaluated their performance on a quarterly and annual basis.  *Id.* ¶¶ 24, 25.

Lopez-Santos' quarterly evaluations of Plaintiff's performance during 2018 included both praise and suggestions for ways Plaintiff could improve.  *Id.* ¶¶ 26, 28, 30.  Around this time, Plaintiff expressed certain personal goals for himself, including following Defendant's "save pro" system for calls and working on his listening skills.  *Id.* ¶ 27.  In evaluating his own performance during the third quarter of 2018, Plaintiff commented on ways in which he had improved and discussed items he still needed to work on.  *Id.* ¶ 31.  Plaintiff attributed as least some of his success during 2018 to Lopez-Santos' help.  *Id.* ¶¶ 29, 33.[1]  Lopez-Santos rated Plaintiff's overall performance in 2018 as "Effective."  *Id.* ¶ 32.

In early 2019, Defendant's retention management held what Defendant refers to as a "calibration meeting."  *Id.* ¶ 37.  During calibration meetings, which are held after the end of each year, retention management discusses and "calibrates" all Retention Agents' ratings and resulting pay increases, if any.  *Id.* ¶ 34.  Clinton, Noonan, all Retention Supervisors, and a Human Resources business partner are typically present for such meetings.  *Id.* ¶ 35.  Retention Supervisors frequently coach and evaluate Retention Agents on other Retention Supervisors'

---

[1] Although Plaintiff does not dispute that he attributed some of his success in 2018 to Lopez-Santos' help, he claims that he "did not have a good relationship" with Lopez-Santos, and that Lopez-Santos "was condescending, profane, aggressive and abusive."  Pl.'s L.R. 56(a)2 St. ¶ 33.

teams. *Id.* ¶ 36. As a result, Retention Supervisors generally have informed opinions, based on their own observations, regarding the performance and behaviors of Retention Agents assigned to other teams. *Id.* At the calibration meeting held in early 2019, retention management determined that the "Effective" rating Lopez-Santos gave Plaintiff for 2018 was appropriate. *Id.* ¶ 38. This rating resulted in Plaintiff receiving a 3% pay increase, from $18.31 to $18.86 per hour, effective March 1, 2019. *Id.* ¶¶ 39–40.

In his evaluation of Plaintiff's performance for the first quarter of 2019, Lopez-Santos was critical of Plaintiff's adherence to the s4x behaviors. *Id.* ¶ 41. Then, in his evaluation of Plaintiff's performance for the second quarter of 2019, Lopez-Santos offered suggestions regarding ways in which Plaintiff could improve. *Id.* ¶ 42. Lopez-Santos later noted improvement in Plaintiff's performance during the third quarter of 2019, and he continued to offer suggestions for how Plaintiff could improve his performance. *Id.* ¶ 43. Lopez-Santos did not complete an evaluation of Plaintiff's performance again after the third quarter of 2019 because, due to team adjustments designed to balance the impact of employee attrition, Plaintiff was reassigned to Retention Supervisor Alayssia Pringle's team as of August 25, 2019. *Id.* ¶¶ 44–45. Like Plaintiff, Pringle is African-American and Black. *Id.* ¶ 46.

Pringle was responsible for rating Plaintiff's overall performance for 2019. *Id.* ¶ 47. Based on her observations of Plaintiff's performance in September through December of 2019, her evaluation of Plaintiff's performance in prior months, and her communications with Lopez-Santos regarding his experience with Plaintiff during the balance of the year, Pringle gave Plaintiff an overall rating of "Off Track" for 2019. *Id.* ¶ 47. Separately, Lopez-Santos remained responsible for giving overall ratings to the fifteen other Retention Agents he supervised. *Id.* ¶ 48. Lopez-

Santos gave two Retention Agents, both of whom were white, "Off Track" ratings; he rated the rest of the Retention Agents, three of whom were Black, as "Effective." *Id.* ¶ 49.

At the calibration meeting for the 2019 performance year, the consensus among retention management was that the "Off Track" overall rating Pringle gave to Plaintiff was appropriate. *Id.* ¶¶ 50–51. Plaintiff's calibrated "Off Track" rating resulted in him receiving a 0.5% pay increase, from $18.86 to $18.95 per hour, effective March 1, 2020. *Id.* ¶¶ 52–53.

Following the calibration meeting for 2019, Pringle met with Plaintiff to discuss his 2019 performance review and inform him of his pay increase. *Id.* ¶ 54. Plaintiff expressed disappointment with his rating and pay increase and, on March 1, 2020, Plaintiff emailed Human Resources Director Kevin Gunning to complain about Lopez-Santos. *Id.* ¶ 55; *see id.* ¶ 35. Among other things, Plaintiff complained that his rating was unfair and that he had been unaware of some of the criticisms regarding his performance. *Id.* ¶ 56. Plaintiff also complained that, at some unspecified time in the past, Lopez-Santos had played him a rap song that had been created by Lopez-Santos' son and contained profanity and the n-word. *Id.* At his deposition, Plaintiff estimated that Lopez-Santos played the song for him during the summer of 2019, and that the song used the n-word ten to fifteen times. *Id.* ¶ 58.[2]

Upon receipt of Plaintiff's email, Gunning investigated Plaintiff's claims. *Id.* ¶ 59. As part of his investigation, Gunning interviewed both Plaintiff and Lopez-Santos. *Id.* ¶ 60. Plaintiff contends that Gunning acknowledged in a conversation that Plaintiff's "numbers" did not reflect that he was ineffective. Pl.'s St. Disp. Facts, ECF No. 41-2, ¶¶ 3, 4, 14 (citing Pl.'s Dep., ECF

---

[2] The record contains conflicting statements regarding the length of the rap song; Plaintiff's complaint and his March 1, 2020, email to Gunning state that the song lasted about six minutes, while Plaintiff testified during his deposition that he believed the song lasted two to three minutes. *See* Pl.'s L.R. 56(a)2 St. ¶ 57.

No. 41-4, at 226–27, 298).[3]  Lopez-Santos, for his part, told Gunning that he played the rap song

for Plaintiff in an effort to develop a better rapport with him, at least in part because Plaintiff was

a musician.  Pl.'s L.R. 56(a)2 St. ¶ 61.  Lopez-Santos acknowledged that, in hindsight and in light

of some of the song's lyrics, he did not exhibit good judgment in playing the song for Plaintiff.  *Id.*

He was contrite and offered to apologize to Plaintiff.  *Id.* ¶ 63.  At his deposition, Plaintiff testified

that Lopez-Santos "said something referring to I guess he knew – a lot of people knew that I played

guitar and I was a musician or something."  *Id.* ¶ 62 (citing Pl.'s Dep., ECF No. 38-2, at 191).

Plaintiff continued:  "I think he started telling me about his son, his son is a rap star, something

like that, and then he asked me if I wanted to hear a song . . . ."  *Id.*

As part of his investigation, Gunning also interviewed four other Retention Agents who

Lopez-Santos supervised, two of whom were Black and two of whom were white.  *Id.* ¶ 64.  Each

of these Retention Agents expressed their belief that Lopez-Santos was a good supervisor and

stated that they got along well with him and had no issues or concerns with him.  *Id.* ¶ 65.  In

addition, Gunning interviewed Noonan, who confirmed that Plaintiff's "Off Track" rating for 2019

was appropriate and that his resulting 0.5% pay increase would not be changed.  *Id.* ¶ 66.

Defendant's management coached Lopez-Santos on his behavior and concluded that this coaching

constituted sufficient remedial action, given the nature of Lopez-Santos' conduct, the intent behind

it, his repentant response when interviewed about it, and his promise to never engage in similar

conduct again.  *Id.* ¶ 67.  At some point, Gunning informed Plaintiff about the outcome of his

investigation.  *Id.* ¶ 68.

---

[3] As the Court noted at oral argument, Plaintiff's "Statement of Disputed Facts" is not a proper submission under
Local Rule 56.

At another unspecified time, Plaintiff also complained to Gunning that Lopez-Santos had compared Plaintiff's appearance to that of a serial rapist who was in the news.[4]  *Id.* ¶ 69.  Plaintiff claims that, while meeting with Plaintiff, Lopez-Santos received a phone call from his wife about a serial rapist in Springfield, Massachusetts.  *Id.* ¶ 70.  When Lopez-Santos relayed this information to Plaintiff, Plaintiff asked him what the rapist looked like, and Lopez-Santos responded by saying that the rapist "kind of look[ed] like" Plaintiff and that the rapist was "kind of mixed" but Lopez-Santos did not know if the rapist was Spanish or Black.  *Id.* (quoting Pl.'s Dep., ECF No. 38-2, at 208–13).

Separately, Plaintiff took issue with the way in which Defendant handled his requests for hardship scheduling accommodations during the spring of 2020.  *See id.* ¶ 77.  In general, Defendant permits employees to request temporary scheduling modifications when the employees are dealing with personal hardships.  *Id.* ¶ 71.  Such scheduling accommodations are usually granted for no more than thirty days.  *Id.* ¶ 72.  At the end of March of 2020, Plaintiff informally asked Noonan for a reduced work schedule in light of his personal circumstances due to the COVID-19 pandemic.  *Id.* ¶ 73.  Noonan approved the request and, as a result, although Plaintiff's regular schedule was to work Monday through Wednesday, Friday, and Saturday from 10:30 a.m. until 7:00 p.m., Plaintiff generally ended each of his workdays between 2:30 p.m. and 5:30 p.m. beginning in late March of 2020.  *Id.* ¶¶ 73–74.

Later, on May 29, 2020, Plaintiff submitted a "hardship request form," in which he requested permission to continue ending each workday at 2:30 p.m. rather than 7:00 p.m.  *Id.* ¶ 75. Plaintiff asserts that he made this request due to the COVID-19 pandemic, and because he was responsible for taking care of his elderly parents and ensuring that his children were being schooled

---

[4] Plaintiff testified that he reported this incident to Gunning, Pl.'s Dep., ECF No. 38-2, at 216:22–217:5, though it is unclear precisely when he did so, Pl.'s L.R. 56(a)2 St. ¶ 69.

at home.  *Id.*  Clinton, who was aware that Plaintiff had already been working the reduced schedule for two months, initially denied Plaintiff's request because schedule reductions were supposed to be temporary.  *Id.* ¶ 76.  On June 5, 2020, after learning of this denial, Plaintiff complained via email to Pringle and Gunning.  *Id.* ¶ 77.  Gunning responded within minutes and told Plaintiff that he would look into his request.  *Id.* ¶ 78.  Gunning then spoke to Clinton, who agreed to grant Plaintiff's request for another thirty days to allow Plaintiff additional time to make personal adjustments and return to his normal schedule.  *Id.*  Gunning informed Plaintiff of the decision to approve Plaintiff's request on June 8, 2020.  *Id.*  Defendant ultimately permitted Plaintiff to continue working the reduced work schedule until October of 2020.  *Id.* ¶ 79.

## II.    PROCEDURAL HISTORY

After receiving a release of administrative agency jurisdiction, ECF No. 38-16, Plaintiff initiated this action in December of 2021, Compl., ECF No. 1.  Plaintiff's complaint alleges eight counts:  (1) race discrimination in violation of Title VII; (2) color discrimination in violation of Title VII; (3) hostile work environment in violation of Title VII; (4) retaliation in violation of Title VII; (5) race discrimination in violation of the CFEPA; (6) color discrimination in violation of the CFEPA; (7) hostile work environment in violation of the CFEPA; and (8) retaliation in violation of the CFEPA.  *Id.*  In December of 2022, following the close of discovery, Defendant filed its present motion seeking summary judgment on each count of Plaintiff's complaint.  ECF No. 36.

## III.    LEGAL STANDARD GOVERNING SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial.  It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'"  *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324).  The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor.  *Anderson*, 477 U.S. at 249.  If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation

and internal quotation marks omitted).  "[O]nly when reasonable minds could not differ as to the

import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d

Cir. 1991).

## IV.   COUNTS ONE, TWO, FIVE, AND SIX:   RACE AND COLOR DISCRIMINATION

The Court begins by denying Defendant's motion to the extent it seeks summary judgment

on Counts One and Two, Plaintiff's claims for race and color discrimination under Title VII, and

Counts Five and Six, Plaintiff's claims for race and color discrimination under the CFEPA.

### A.   Legal Standard

Both Title VII and the CFEPA prohibit employment discrimination based on, among other

things, an individual's race, color, or national origin.  42 U.S.C. § 2000e-2(a)(1); Conn. Gen. Stat.

§ 46a-60(b)(1).  The substantive standards governing Title VII employment discrimination claims

are well established, *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010), and they apply

to discrimination claims brought under the CFEPA as well, *Martinez v. Conn., State Libr.*, 817 F.

Supp. 2d 28, 55 (D. Conn. 2011) (citing, among other cases, *Craine v. Trinity Coll.*, 259 Conn.

625, 637 n.6, 791 A.2d 518 (2002)).[5]

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the U.S. Supreme Court "set

forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging

discriminatory treatment" by an employer.  *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248,

252 (1981).  Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of

establishing a *prima facie* case of discrimination.  *Id.* at 252–53; *Dister v. Cont'l Grp., Inc.*, 859

F.2d 1108, 1111–12 (2d Cir. 1988); *Gannon v. United Parcel Serv.*, 529 F. App'x 102, 103 (2d

---

[5] The parties agree that, for purposes of Defendant's present motion, Plaintiff's race and color discrimination claims under both Title VII and the CFEPA can be addressed using the same analysis.  *See* ECF No. 37 at 15 n.14; ECF No. 41-1 at 8.

Cir. 2013) (summary order).  To make out a *prima facie* case, a plaintiff must establish that:  "(1) he is a member of a protected class; (2) he performed the job satisfactorily or was qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination."  *Orlando v. Dep't of Transp., Comm'r*, 459 F. App'x 8, 9 (2d Cir. 2012) (summary order) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).  The plaintiff's burden of establishing a *prima facie* case of discrimination is *de minimis*.  *Burdine*, 450 U.S. at 253 (noting that the plaintiff's burden of satisfying a *prima facie* case is "not onerous"); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).

If the plaintiff satisfies his *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the challenged employment action.  *Burdine*, 450 U.S. at 254; *Weinstock*, 224 F.3d at 42.  If the defendant does so, the burden shifts back to the plaintiff to show that the proffered reason is "not the true reason" or is otherwise pretextual.  *Burdine*, 450 U.S. at 256.  Although the *McDonnell Douglas* framework effectively shifts the "intermediate evidentiary burdens" between the plaintiff and defendant, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (cleaned up) (quoting *Burdine*, 450 U.S. at 253).

B.  Discussion

Defendant contends that Plaintiff's race and color discrimination claims must fail because Plaintiff has not established his *prima facie* case and because, even if Plaintiff has established his *prima facie* case, he cannot show that Defendant's proffered legitimate, non-discriminatory reason for the employment action Plaintiff challenges is a pretext for discrimination.  For the reasons

below, the Court disagrees with both of Defendant's arguments and therefore denies Defendant's request for summary judgment on Counts One, Two, Five, and Six.

### 1. Plaintiff's Prima Facie Case

With respect to Plaintiff's *prima facie* case, Defendant does not dispute that Plaintiff is a member of a protected class or that he performed his job satisfactorily. Rather, Defendant contests only the third and fourth prongs of Plaintiff's *prima facie* case: that Plaintiff suffered an adverse employment action and that the action occurred under circumstances giving rise to an inference of discrimination. For the reasons below, the Court finds that Plaintiff has carried his *de minimis* burden of establishing his *prima facie* case.

### a.    Adverse Employment Action

The Court first finds that Plaintiff's receipt of a 0.5% hourly wage increase based on his performance evaluation for 2019, rather than the 3% increase he claims was warranted, constitutes an adverse employment action for purposes of his *prima facie* case.

A plaintiff sustains an adverse employment action if he "endures a materially adverse change in the terms and conditions of his employment." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015). Such an action "is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* Examples of materially adverse changes include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* Relevant here, courts in this Circuit have repeatedly found that "[d]enial of a raise or merit bonus where one is warranted constitutes an adverse job action." *See Ebanks v. Neiman Marcus Grp., Inc.*, 414 F. Supp. 2d 320, 331 (S.D.N.Y. 2006); *Nidzon v. Konica Minolta Bus. Sols., USA, Inc.*, 752 F. Supp. 2d 336, 349 (S.D.N.Y. 2010)

("Under the law of the Second Circuit, the denial of a salary increase is . . . sufficiently material to constitute an adverse employment action."); *Lin v. UT Freight Serv. (USA) Ltd.*, No. 18-CV-07042 (DLI) (RLM), 2022 WL 767863, at *5 (E.D.N.Y. Mar. 14, 2022) (recognizing that there is "little question that denial of a raise qualifies as an adverse employment action" in an age discrimination case).

Although Plaintiff was not denied a raise entirely following the 2019 performance year, the Court finds that his receipt of a smaller raise than he claims was warranted nonetheless constitutes an adverse employment action for purposes of his *prima facie* case. Defendant has not pointed to any controlling case law holding that a *decrease* in pay, rather than an increase that is smaller than the plaintiff claims he was entitled to receive, is required to demonstrate an adverse employment action. Instead, decisions in this Circuit lead the Court to the opposite conclusion. *See Burgos v. Sullivan & Cromwell*, No. 99 CIV 11437, 2001 WL 709268, at *7 (S.D.N.Y. June 25, 2001) (finding that receipt of a raise smaller than that given to another employee could constitute an adverse employment action); *DeNigris v. N.Y.C. Health & Hosps. Corp.*, 861 F. Supp. 2d 185, 194–95 (S.D.N.Y. 2012) (finding that a reasonable jury could conclude that the defendants' decisions regarding the plaintiff's salary "as compared with her prior salary and those offered to other candidates," including "the denial of a raise despite her highly positive performance reviews," were sufficiently adverse). Although Defendant cites to *Milligan v. Citibank, N.A.*, which acknowledges that it could be "difficult to see" how receiving a raise could be considered an adverse employment action, the court there made clear it was *not* finding that "receiving a smaller raise than a similarly situated employee who had performed equally can never, under any circumstances, be adverse." No. 00 CIV. 2793 (AGS), 2001 WL 1135943, at *4 (S.D.N.Y. Sept. 26, 2001).

The Court finds that Plaintiff's 0.5% raise resulting from his negative performance evaluation for 2019 constitutes an adverse employment action. Even though Plaintiff received a raise in pay, the raise was substantially lower than that to which Plaintiff believes he was entitled, and the 2.5% difference is significant enough to constitute a materially adverse change in employment. As Plaintiff points out, had he received the 3% increase, he would have earned nearly $1,200 more annually; for a person at Plaintiff's earnings level, this is a meaningful difference in salary.

Moreover, Defendant's argument that Plaintiff's "Off Track" rating for 2019, which precipitated his 0.5% raise, cannot constitute a materially adverse change in the terms and conditions of Plaintiff's employment is unavailing. The only case Defendant cites in support of this proposition simply provides that negative evaluations are not materially adverse employment actions "*unless* such conduct is accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss." *Flowers v. Conn. Light & Power Co.*, No. 3:15-CV-534 (VLB), 2017 WL 11552984, at *14 (D. Conn. Sept. 29, 2017) (emphasis added) (quoting *Green v. Jacob & Co. Watches, Inc.*, 248 F. Supp. 3d 458, 468 (S.D.N.Y. 2017)), *aff'd*, 774 F. App'x 33 (2d Cir. 2019) (summary order). But Plaintiff's receipt of only a 0.5% raise constitutes a tangible "negative consequence" precipitated by his negative evaluation for 2019. Thus, given Plaintiff's evidence that, as a result of his "Off Track" rating, he was denied the 3% raise he claims was warranted, this case is distinguishable from *Flowers*.

Accordingly, the Court finds that, under the circumstances of this case, Plaintiff's receipt of a smaller raise than he claims was appropriate constitutes an adverse employment action for purposes of his discrimination claims.

b.       Inference of Discrimination

The Court likewise finds that Plaintiff has met his *de minimis* burden of raising an inference of discrimination for purposes of his *prima facie* case.

With respect to this fourth *prima facie* element, "there is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996). Rather, this element is a "flexible one that can be satisfied differently in differing factual scenarios." *Id.* Circumstances that could potentially give rise to an inference of discriminatory motive include actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus, preferential treatment given to employees outside the protected class, or a pattern of recommending the plaintiff for positions for which he is not qualified and failure to surface the plaintiff's name for positions for which he is well-qualified. *Id.* Whatever the factual scenario, it is essential that a plaintiff "come forward with some evidence, beyond merely stating that he is a member of a protected class who suffered an adverse employment decision." *James v. Mun. Credit Union*, No. 13CV4568-LTS-KNF, 2016 WL 698136, at *4 (S.D.N.Y. Feb. 19, 2016).

At the outset, the Court notes that Lopez-Santos' comment comparing Plaintiff's appearance to that of a serial rapist, on its own, would be insufficient to raise an inference of discrimination. The Second Circuit has repeatedly held that "stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination." *Adams v. Master Carvers of Jamestown, Ltd.*, 91 F. App'x 718, 722 (2d Cir. 2004) (summary order) (quoting *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)). Thus, standing alone, Lopez-Santos' single stray remark comparing Plaintiff's appearance to that of a serial rapist does not raise an inference of discrimination.

15

Remarks by a decision-maker, however, "will no longer be considered 'stray' if the plaintiff sets forth 'other indicia of discrimination.'"  *Id.*  In this case, the remark regarding Plaintiff's appearance does not stand alone as the only alleged offensive conduct attributed to Lopez-Santos.  Rather, Plaintiff has also presented evidence that, around the time Lopez-Santos was completing quarterly evaluations regarding Plaintiff's performance in 2019, he played a rap song for Plaintiff that featured profanity and the n-word several times.[6]  Lopez-Santos' comment regarding Plaintiff's appearance must be viewed alongside the evidence regarding the rap song incident, which constitutes an additional indication that Lopez-Santos may have harbored some discriminatory animus against African-American and Black individuals.

While these incidents with Lopez-Santos could be viewed as isolated occurrences, the Court is mindful of the deeply offensive nature of the language featured in the rap song Lopez-Santos intentionally chose to play for Plaintiff, an African-American and Black man.  The playing of the rap song under these circumstances is evidence of possible discriminatory animus; when this evidence is combined with the facts that Lopez-Santos provided input to Pringle when she drafted Plaintiff's 2019 "Off Track" rating and participated in the calibration meeting at which that rating was affirmed, it suffices to raise an inference that Plaintiff's low raise may have been motivated by discrimination, for purposes of the *de minimis* burden Plaintiff bears for his *prima facie* case.

The Court will therefore proceed to the two remaining steps of the *McDonnell Douglas* burden-shifting framework.

---

[6] Lopez-Santos testified that he listened to at least part of the song before he played it for Plaintiff and, thus, it is reasonable to infer that he was aware of the offensive language the song featured.  Lopez-Santos Dep., ECF No. 41-6, at 35:1–7.

### 2.   *Defendant's Proffered Legitimate, Non-Discriminatory Reason*

Because the Court has found that Plaintiff has established his *prima facie* case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its decision to award Plaintiff a 0.5% raise based on his performance evaluation for 2019.   Defendant asserts that Plaintiff's "Off Track" rating for 2019 was based on Lopez-Santos' first, second, and third quarter assessments of Plaintiff's performance, Pringle's fourth quarter assessment of Plaintiff's performance, and the consensus among retention management during the calibration meeting for 2019.  ECF No. 37 at 19.  Defendant further asserts that Lopez-Santos' and Pringle's assessments reference specific aspects of Plaintiff's performance that retention management believed to be "Off Track," including the quantitative metrics and, qualitatively, the extent to which Plaintiff was exhibiting the s4x behaviors.  *Id.*  These assertions are supported by evidence in the record, including Plaintiff's 2019 performance evaluation, ECF No. 38-9, and affidavits from Gunning and Pringle, Gunning Aff., ECF No. 38-1, ¶¶ 26–28, 36–37; Pringle Aff., ECF No. 38-10, ¶¶ 5–7.  This evidence suffices to show a legitimate, non-discriminatory reason for Plaintiff's "Off Track" rating and 0.5% raise and, as a result, the burden shifts back to Plaintiff to show that Defendant's reason is not the true reason or that it is otherwise pretextual.

### 3.   *Whether Plaintiff Can Meet His Ultimate Burden of Persuading the Trier of Fact that Defendant Discriminated Against Him*

The final step of the *McDonnell Douglas* framework requires the Court to examine the entire record—including evidence from Plaintiff's *prima facie* case, additional evidence suggesting pretext, and other evidence of Defendant's discriminatory intent—to determine whether Plaintiff could satisfy his ultimate burden of persuading the trier of fact that Defendant intentionally discriminated against him.  *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000); *see also Burdine*, 450 U.S. at 256 (explaining that the plaintiff's third-step burden to demonstrate

pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination"). For the reasons below, the Court finds that Plaintiff has raised genuine disputes of material fact as to whether discrimination was a motivating factor in Defendant's decision to give him an "Off Track" overall rating for 2019 and a resulting 0.5% raise.

Under Supreme Court precedent, a plaintiff's *prima facie* case, "combined with sufficient evidence to find that the employer's asserted justification is false," *may* be sufficient to withstand summary judgment under the *McDonnell Douglas* framework. *Reeves*, 530 U.S. at 148; *see James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156–57 (2d Cir. 2000) (stating that "evidence satisfying the minimal *McDonnell Douglas prima facie* case, coupled with evidence of falsity of the employer's explanation, may or may not be sufficient to sustain a finding of discrimination" (italicization added)); *see also Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."). The Supreme Court "has indicated that only occasionally will a *prima facie* case plus pretext fall short of the burden a plaintiff carries to reach a jury on the ultimate question of discrimination but that such occasions do exist." *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 382 (2d Cir. 2001). For example, "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148.

The Second Circuit has made clear that *Reeves* "mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against [him].'"

*Schnabel*, 232 F.3d at 90.  Thus, the Court must "examine the entire record and make [a] case-specific assessment as to whether a finding of discrimination may reasonably be made."  *Howard v. Port Auth.*, 771 F. App'x 130, 132 (2d Cir. 2019) (amended summary order) (alteration in original) (internal quotation marks omitted).  "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors," including the "strength of the plaintiff's *prima facie* case," the "probative value of the proof that the employer's explanation is false," and any other properly considered evidence that supports the employer's case.  *Reeves*, 530 U.S. at 148–49 (italicization added).

Importantly, a plaintiff may carry his "ultimate burden" of demonstrating that a challenged employment decision was the result of intentional discrimination by establishing his *prima facie* case and then presenting "additional evidence showing that 'the employer's proffered explanation is unworthy of credence.'"  *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995) (citing *Burdine*, 450 U.S. at 256).  In doing so, a plaintiff may rely on evidence demonstrating "weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's proffered explanations for its action, *Greenberg v. State Univ. Hosp. – Downstate Med. Ctr.*, 838 F. App'x 603, 606 (2d Cir. 2020) (summary order), because "[f]rom such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason," *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

Here, the Court holds that a reasonable jury could find in Plaintiff's favor on his discrimination claims, so summary judgment would be inappropriate.  Plaintiff testified that Gunning told him that, based on an investigation Gunning conducted, Plaintiff "didn't have any issues" with his "numbers" in 2019, and Plaintiff's "numbers" for 2019 did not show that he was ineffective.  Pl.'s Dep., ECF No. 41-4, at 226:7–227:1.  While the evidence on this issue is not

robust, a jury could perceive Plaintiff's testimony about Gunning's representations as contradicting Defendant's proffered reason for Plaintiff's 2019 rating and resulting 0.5% raise.[7] A reasonable jury could find, based on Gunning's comments, that Plaintiff's performance was not in fact quantitatively ineffective.  A reasonable jury could further find, based on Lopez-Santos' playing of the rap song and comment about Plaintiff's complexion resembling that of a serial rapist, that Lopez-Santos harbored possible discriminatory animus and that such animus may have played a role in Plaintiff's "Off Track" rating and resulting lower raise.  Importantly, Lopez-Santos provided input for the rating and participated in the calibration meeting where the rating was confirmed.  The Court therefore finds that the evidence of Gunning's comments, coupled with the evidence put forward in Plaintiff's *prima facie* case, are sufficient to withstand summary judgment as to Plaintiff's discrimination claims.

The Court is unpersuaded by Defendant's contention that, even if Plaintiff's quantitative numbers did not evince ineffectiveness, his qualitative performance did, such that Plaintiff cannot sustain his ultimate burden of proving discrimination.  Although Plaintiff's 2019 evaluation discusses at length his failure to exhibit Defendant's s4x behaviors, the evaluation does not discuss Plaintiff's performance *solely* in terms of qualitative behavioral metrics.  Rather, the 2019 evaluation discusses issues with Plaintiff's performance as measured by Defendant's quantitative metrics as well.  *See* ECF No. 38-9 at 2 ("[Plaintiff's] FCR has been another area of opportunity."); *id.* at 4 (noting that Plaintiff "missed Rev retained in April").  Indeed, Defendant has expressly argued that Plaintiff's quantitative metrics played a role in his 2019 rating because his Revenue

---

[7] While Plaintiff's briefing states that "Human resources acknowledged that [Lopez-Santos] falsified his performance review," ECF No. 41-1 at 2, Plaintiff's counsel conceded at oral argument that there is no evidence of *falsification* of the performance review; rather, Plaintiff acknowledges the numbers were accurately reported, but believes they did not demonstrate his ineffectiveness, based on Gunning's comments.  In the future, Plaintiff's counsel should be careful not to overstate the evidence, as he has done here.

Retained and FCR metrics were "Off Track." *See* ECF No. 37 at 19. Gunning's purported statements—that Plaintiff's "numbers" did not demonstrate ineffectiveness—appear to directly contradict this assertion. Thus, if a jury were to find Plaintiff's testimony regarding Gunning's purported statements to be credible, the jury could reasonably find such statements to contradict Defendant's proffered reason for Plaintiff's 0.5% raise.

The Court acknowledges Defendant's assertions that Lopez-Santos had given Plaintiff positive ratings in the past, that discriminatory animus is not evident in Lopez-Santos' ratings of other Retention Agents, including some who are Black, and that Defendant's calibration of Retention Agents' ratings reduces the risk that discriminatory bias will enter the rating process. While a jury may well find this evidence persuasive, the Court cannot conclude that the record has "*conclusively* revealed some other, nondiscriminatory reason for [Defendant's] decision," or that there is "*abundant* and *uncontroverted* independent evidence that no discrimination [has] occurred," *see Reeves*, 530 U.S. at 148 (emphasis added). Rather, the record includes both evidence in support of Defendant's proffered reason *and* evidence from which a jury could conclude that Lopez-Santos' alleged discriminatory animus may have played a role in Plaintiff's 2019 rating and resulting minimal raise. At summary judgment, it is simply not the Court's role to assess witness credibility or to otherwise weigh the evidence the parties have presented. *See Kee*, 12 F.4th at 166 ("With respect to the evidence, at the summary judgment stage, the district court is not permitted to make credibility determinations or weigh the evidence . . . for these are 'jury functions, not those of a judge.'" (quoting *Anderson*, 477 U.S. at 255)). Thus, Defendant's arguments do not present a basis for the Court to decide Plaintiff's discrimination claims as a matter of law.

In sum, upon review of the record, the Court cannot conclude that this is one of the rare cases in which a plaintiff's *prima facie* case, coupled with evidence of pretext, is insufficient to withstand summary judgment.  Rather, Plaintiff's evidence of Lopez-Santos' racially offensive conduct, coupled with his testimony that Gunning told him that his quantitative metrics showed that he was not ineffective in his work, raise genuine issues of material fact as to whether discriminatory animus at least partially motivated the "Off Track" rating and resulting raise Plaintiff received in 2019.  For these reasons, the Court denies Defendant's motion to the extent it seeks summary judgment on Counts One, Two, Five, and Six, Plaintiff's discrimination claims.

## V.     COUNTS THREE AND SEVEN:  HOSTILE WORK ENVIRONMENT

The Court next grants Defendant's motion to the extent it seeks summary judgment on Counts Three and Seven, Plaintiff's hostile work environment claims brought under Title VII and the CFEPA, respectively.[8]

### A.  Legal Standard

A hostile work environment exists when the "workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment."  *Littlejohn v. City of New York*, 795 F.3d 297, 320 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  The standards governing hostile work environment claims under Title VII and the CFEPA are the same.  *Martinez*, 817 F. Supp. 2d at 55.

A hostile work environment claim has both objective and subjective components:  first, objectively, the conduct complained of must be "severe or pervasive enough that a reasonable

---

[8] Although Plaintiff's CFEPA claim in Count Seven is labeled "Hostile Work Environment/Race Harassment," Plaintiff's counsel confirmed at oral argument that Count Seven simply alleges a hostile work environment claim indistinguishable from Plaintiff's Title VII hostile work environment claim in Count Three.

person would find it hostile or abusive"; and second, "the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014).   In general, the hostile incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).  "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.*  That said, a hostile work environment claim is necessarily "based on the cumulative effect of individual acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).  In sum, to determine whether Plaintiff suffered a hostile work environment, the Court must "consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Littlejohn*, 795 F.3d at 321.

B.  Discussion

Plaintiff's hostile work environment claim is based on two incidents:  first, Lopez-Santos' playing of the rap song for Plaintiff that contained ten to fifteen incidents of the n-word; and second, Lopez-Santos' comparison of Plaintiff's likeness to that of a serial rapist in the news.  For the reasons below, the Court concludes that these two instances are insufficient to establish a genuine issue of material fact as to whether Plaintiff was subjected to a hostile work environment.

The Second Circuit has held that, when a plaintiff claims that he was subjected to a hostile work environment based on "racist comments, slurs, and jokes," he must show "more than a few isolated incidents of racial enmity." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citation omitted).  In other words, "[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Id.* (citation omitted) (alteration in original).  Therefore, whether racial slurs or incidents constitute a hostile work environment typically depends upon the quantity,

frequency, and severity of those slurs or incidents, "considered cumulatively in order to obtain a realistic view of the work environment." *Id.* at 110–11 (internal citations and quotation marks omitted). Here, though Lopez-Santos' conduct was deeply offensive, Plaintiff has cited only two isolated incidents involving Lopez-Santos: his playing of a rap song with offensive lyrics and his comparison of Plaintiff to a serial rapist who had not yet been arrested. Plaintiff has failed to establish a genuine dispute of material fact as to whether the conduct he complains of was objectively "severe or pervasive enough that a reasonable person would find it hostile or abusive." *See Raspardo*, 770 F.3d at 114; *Marvelli v. Chaps Cmty. Health Ctr.*, 193 F. Supp. 2d 636, 652 (E.D.N.Y. 2002) (granting summary judgment on hostile work environment claim where plaintiff "describe[d] only three instances involving racial comments directed at her").

Plaintiff contends that the playing of the rap song was especially egregious because the song featured the n-word ten to fifteen times. There is no question that, as he admitted, Lopez-Santos exercised poor judgment in playing a rap song for Plaintiff that repeatedly used the n-word. Nor is there any question as to the deeply offensive nature of this incident. Lopez-Santos' comments comparing Plaintiff's likeness to that of a serial rapist were likewise offensive. But these two instances, without more, are simply insufficient to establish that Plaintiff was subjected to a hostile work environment. *See Chukwuka v. City of New York*, 513 F. App'x 34, 36 (2d Cir. 2013) (summary order) ("Although a single act can meet this threshold if it transforms the plaintiff's workplace, '[i]solated acts, unless very serious, do not meet the threshold of severity or pervasiveness.'" (alteration in original) (quoting *Alfano*, 294 F.3d at 374)). The Court cannot conclude that the single instance of the playing of a song exhibiting offensive language, coupled with one other incident of insensitive remarks, rises to the level of a hostile work environment. *See Payne v. Brinks, Inc.*, 517 F. Supp. 2d 653, 659 (W.D.N.Y. 2007) (finding that "8–12 incidents

of offensive language plaintiff describe[d] having overheard" did not rise to the level of a hostile work environment); *see also Chukwuka*, 513 F. App'x at 35–36 ("A plaintiff must show that 'a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment.'" (alteration in original) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)). Accordingly, Plaintiff's evidence that the rap song used the n-word several times, given that the song itself was played only once, does not save his hostile work environment claims.

For these reasons, the Court grants Defendant's motion to the extent it requests summary judgment on Counts Three and Seven, Plaintiff's hostile work environment claims.

## VI.     COUNTS FOUR AND EIGHT:  RETALIATION

Finally, the Court grants summary judgment in favor of Defendant on Counts Four and Eight, Plaintiff's claims that Defendant retaliated against him in violation of Title VII and the CFEPA, respectively.

### A.  Legal Standard

Title VII prohibits an employer from retaliating against an employee because the employee has opposed any practice made unlawful by Title VII.  42 U.S.C. § 2000e-3(a); *Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015).  The objective of this provision "is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice."  *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).  An employee "engages in a protected activity when he protests or opposes an employment practice that he reasonably believes, in good faith, violates the law."  *Joseph v. Marco Polo Network, Inc.*, No. 09 Civ. 1597 (DLC), 2010 WL 4513298, at *17 (S.D.N.Y. Nov. 10, 2010) (citing *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir.

2006)).   An employee opposes discrimination by, for example, raising informal complaints of discriminatory employment practices to management.  *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).

Likewise, the CFEPA prohibits discrimination against "any person because such person has opposed any discriminatory employment practice."  Conn. Gen. Stat. § 46a-60(a)(4).  The analysis of retaliation claims under the CFEPA is "the same as under Title VII," *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010) (citing *Craine*, 259 Conn. at 637 n.6); *Martinez*, 817 F. Supp. 2d at 55, and claims under both statutes are analyzed pursuant to the *McDonnell Douglas* burden-shifting framework, *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019).

Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of retaliation by demonstrating:   "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *see also Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012).  The plaintiff's burden in establishing his *prima facie* case is *de minimis*, and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  *Hicks*, 593 F.3d at 164.

If the plaintiff establishes a *prima facie* case, the defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action."  *Id.*  If the defendant does so, the burden shifts back to the plaintiff to show that the proffered reason is pretextual.  *Kwan*, 737 F.3d at 846.  The plaintiff's ultimate burden is to show that retaliation was "a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's

26

decision." *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349, 360 (2013)).  But-

for causation "does not require proof that retaliation was the only cause of the employer's action,

but only that the adverse action would not have occurred in the absence of the retaliatory motive."

*Id.*

        B.  <u>Discussion</u>

Defendant does not dispute that Plaintiff engaged in protected activity by complaining to

Gunning about Lopez, or that Defendant knew about that protected activity.  Defendant contends,

however, that Plaintiff's retaliation claims must fail at the *prima facie* stage because he has failed

to provide evidence of any adverse employment action that bears a causal connection to his

protected activity.  Specifically, Defendant asserts that the initial denial of Plaintiff's formal

request for a hardship scheduling modification did not constitute an adverse employment action

and, even if it did, Plaintiff has failed to present evidence that there was a causal connection

between his protected activity and the initial denial.  In response, Plaintiff asserts that his retaliation

claims do not solely pertain to the initial denial of his hardship request; rather, Defendant also

retaliated against him by failing to provide him with a 3% pay increase following the 2019

performance year.  For the reasons below, the Court finds that Plaintiff has failed to meet his

burden of setting forth a *prima facie* case of retaliation under Title VII and the CFEPA.

At the outset, the Court finds that the only employment action relevant to Plaintiff's

retaliation claims is Defendant's initial denial of his formal hardship request.  As noted, Plaintiff

attempts to characterize his retaliation claims as pertaining to both Defendant's refusal to provide

him with a 3% raise and the initial denial of his hardship request.  It is undisputed, however, that

Defendant's decision to grant Plaintiff a 0.5% raise occurred *before* Plaintiff engaged in the

protected activity at issue:  writing to Gunning to complain about Lopez-Santos playing the rap

song.   In opposing summary judgment on his retaliation claims, Plaintiff asserts that he

"commenced his protected activity on March 1, 2020," the date on which he sent his email to

Gunning complaining about Lopez-Santos.  ECF No. 41-1 at 20; ECF No. 38-11 (Plaintiff's March

1, 2020, email to Gunning).  Plaintiff further admits that he began to complain about Lopez-Santos

*after* Pringle told him that he would only be receiving a 0.5% pay increase based on his 2019

performance evaluation and thus *after* the calibration meeting in which retention management

agreed that Plaintiff should receive an "Off Track" rating and 0.5% raise.  Pl.'s L.R. 56(a)2 St. ¶¶

54–55.[9]  Because Defendant's decision to award Plaintiff a 0.5% raise occurred before Plaintiff

took part in a protected activity, Plaintiff's protected activity could not possibly have caused that

decision, and the 0.5% raise cannot serve as a basis for Plaintiff's retaliation claims.  *See Cook v.*

*CBS, Inc.*, 47 F. App'x 594, 597 (2d Cir. 2002) (summary order) ("[E]ven if sending this letter . .

. amounts to protected activity, the letter could not possibly have caused the allegedly adverse

actions complained of, all of which occurred before it was written."); *Becker v. Buffalo Pub. Sch.*,

669 F. App'x 36, 37 (2d Cir. 2016) (summary order) (where decision not to hire the plaintiff

occurred before he engaged in protected activity, judgment as a matter of law in defendant's favor

on retaliation claim was proper); *Hassan v. City of Ithaca*, No. 6:11-CV-06535 MAT, 2015 WL

5943492, at *14 (W.D.N.Y. Oct. 13, 2015) ("[T]he alleged protected activity occurred after the

adverse action, and therefore cannot be a 'but for' cause of the adverse action.").  Thus, the only

---

[9] At his deposition, Plaintiff testified that he had a meeting with Noonan and Pringle one or two days before he sent his email to Gunning.  *See* Pl.'s Dep., ECF No. 41-4, at 217:6–15.  Plaintiff further testified, however, that he raised neither Lopez-Santos' playing of the rap song nor Lopez-Santos' comparison of Plaintiff's appearance to that of a serial rapist during that meeting.  The record and Defendant's briefing also include conflicting statements as to whether the calibration meeting for 2019 occurred in late 2019 or early 2020.  *Compare* Pringle Aff. ¶ 6 (stating that the meeting took place in late 2019), *with* ECF No. 37 at 19 (discussing the "early 2020 calibration meeting").  Notwithstanding any uncertainties regarding the precise dates of relevant events, however, there is no genuine dispute that Plaintiff began complaining about Lopez-Santos *after* Pringle notified him that he would be receiving a 0.5% pay increase.  *See* Pl.'s L.R. 56(a)2 St. ¶¶ 50–51, 54–55; *see also* Pl.'s Dep., ECF No. 41-4, at 212:25–214:12 (discussing how Plaintiff did not initially report Lopez-Santos' comments comparing Plaintiff's appearance to that of a serial rapist).

employment action pertinent to Plaintiff's retaliation claims is Defendant's initial denial of Plaintiff's formal hardship request.[10]

Turning to Plaintiff's assertion that Defendant retaliated against him by initially denying his formal hardship request, the Court finds that this denial does not amount to an adverse employment action.  To establish an adverse action for purposes of a Title VII retaliation claim, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse," which, in this context, means that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted).  Title VII "does not set forth a general civility code for the American workplace," and "[p]etty slights or minor annoyances that often take place at work and that all employees experience do not constitute actionable retaliation." *Hicks*, 593 F.3d at 165 (internal quotation marks omitted).  Therefore, Title VII protects only against retaliation "that produces an injury or harm." *Id.*

It is undisputed that Plaintiff began working a reduced work schedule in late March of 2020, and that, on May 29, 2020, he submitted a "hardship request form" to Defendant requesting that he be allowed to continue working that reduced schedule.  Pl.'s L.R. 56(a)2 St. ¶¶ 73–75.  Shortly thereafter, on Friday, June 5, 2020, Plaintiff sent an email to Gunning and Pringle stating that he "was recently made aware" that his request was denied and asking that the denial be provided to him in writing.  *Id.* ¶ 77; ECF No. 38-14 at 4.  Gunning responded to Plaintiff within

---

[10] The Court is unpersuaded by Plaintiff's argument that Defendant's failure to increase the amount of his raise after he complained of Lopez-Santos' conduct constitutes an independent adverse employment action.  Plaintiff has offered no case law in support of his theory that, when an employer has taken an adverse employment action *before* a plaintiff participates in protected activity, the employer's failure to rectify that action after the plaintiff has participated in protected activity constitutes a *separate* adverse employment action in the retaliation context.  To the contrary, case law in this Circuit suggests the opposite.  *Dansler-Hill v. Rochester Inst. of Tech.*, 764 F. Supp. 2d 577, 582 (W.D.N.Y. 2011) ("The crux of any retaliation claim is a cause-and-effect relationship whereby protected activity precedes, and gives rise to, an adverse employment action.").

minutes and, on the following Monday, June 8, 2020, Gunning informed Plaintiff that his request would in fact be granted.  Pl.'s L.R. 56(a)2 St. ¶ 78; ECF No. 38-14 at 2–3.  Plaintiff continued to work a reduced work schedule until October of 2020.  Pl.'s L.R. 56(a)2 St. ¶ 79.

Based on this sequence of events, Plaintiff has not shown that a reasonable employee would have found the initial denial of his hardship request to be materially adverse or, in other words, that the denial "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *see White*, 548 U.S. at 68.  At the outset, the period between the initial denial and ultimate approval of the request lasted only three days.  Plaintiff has offered no basis in the law for the Court to conclude that such a short delay rises to the level of an adverse employment action under these circumstances.  *See Malcolm v. Honeoye Falls Lima Cent. Sch. Dist.*, 483 F. App'x 660, 662 (2d Cir. 2012) (summary order) (affirming dismissal of retaliation claim after concluding that "[a]ny alleged delays attributable to [the defendant] in processing [the plaintiff's] COBRA benefits were immaterial because such delays would not 'deter a reasonable worker in the plaintiff's position from exercising her legal rights'" (cleaned up)); *see also Banks v. Gen. Motors, LLC*, No. 14-CV-970S, 2021 WL 4323909, at *6 (W.D.N.Y. Sept. 23, 2021) ("Courts have acknowledged that delayed payment of benefits when reinstated later is not an adverse employment action . . . ." (citing, in part, *White*, 548 U.S. at 67)).

Nor has Plaintiff shown that this alleged retaliation "produce[d] an injury or harm."  *See Hicks*, 593 F.3d at 165.  Notably, at the time Plaintiff submitted his hardship request form, he was already working a reduced schedule.  Plaintiff's counsel confirmed at oral argument that Plaintiff was *not* required to revert to his full work schedule during any portion of the period between the submission of his request and Defendant's approval of the request.  To the contrary, Plaintiff has admitted that "from late March 2020 onward," he generally ended his workday between 2:30 p.m.

and 5:30 p.m.  Pl.'s L.R. 56(a)2 St. ¶ 74.  Thus, Plaintiff has failed to show how the brief delay in granting his formal hardship request caused him any injury or harm.  *Cf. Messer v. Bd. of Educ. of City of N.Y.*, No. 01-CV-6129 JFB CLP, 2007 WL 136027, at *13 (E.D.N.Y. Jan. 16, 2007) ("Because plaintiffs were not actually denied health care coverage during the relevant time period, they are unable to demonstrate that the first health benefit termination constituted a materially adverse employment action.").  Accordingly, Defendant's initial denial and ultimate approval of Plaintiff's hardship request did not constitute an adverse employment action for purposes of Plaintiff's retaliation claims.

For these reasons, Plaintiff has failed to present evidence that he experienced any adverse employment action after he engaged in protected activity.  The Court therefore grants summary judgment for Defendant on Counts Four and Eight, Plaintiff's retaliation claims.

## VII.    CONCLUSION

For the reasons described herein, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  The Court will convene a conference with the parties to set a trial date and deadlines for pretrial submissions with respect to Plaintiff's race and color discrimination claims in Counts One, Two, Five, and Six.

**SO ORDERED** at Hartford, Connecticut, this 17th day of July, 2023.

 */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE